## ARNOLD v. LANGMUIR.

Court of Customs and Patent Appeals. January 13, 1930.

Patent Appeal No. 2188.

F. T. Woodward and R. R. Adams, both of New York City, and Elmer V. Briggs, for appellant.

Charles E. Tullar, of Schenectady, N. Y. (Harry E. Dunham, of Schenectady, N. Y., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge. ██ Interference proceedings were instituted in the Patent Office between the appellant, Harold D. Arnold, and the appellee, Irving Langmuir. The subject-matter of the interference is contained in twelve counts, three of which are typical and which are as follows:

"1. An oscillation generator comprising a resonant circuit for determining the frequency supplied by said generator; a load circuit adapted to be energized by said generator and a three electrode electric discharge repeater for transferring alternating current energy from said generator to said load cir-

cuit and preventing said load circuit from reacting on said generator."

"5. An oscillation generator of the audion type, an alternating current load circuit and an audion repeater between said generator and said load circuit whereby the frequency of the current supplied by said generator is independent of the character of said load circuit."

"6. An oscillation generator comprising a discharge device having an input circuit and an output circuit reacting on said input circuit, a load circuit for coupling said generator to a load, and an asymmetrically conducting repeater in circuit between said generator and said load for preventing said load from reacting on said generator."

The senior party, Langmuir, filed his divisional application, serial No. 708,820, on April 24, 1924. This was claimed to be a division of a prior application, serial No. 797,987, filed October 29, 1913, and which said original application was pending at the time this interference was declared. The junior party, Arnold, filed his application for patent August 28, 1917, serial No. 188,562, and which application ripened into a patent on February 25, 1924. On March 23, 1925, Arnold moved that the burden of proof in the interference matter should be shifted to rest upon Langmuir, for the reason that the counts involved in this interference are not supported by the disclosure in Langmuir's earlier application, No. 797,987, and that Langmuir should therefore be restricted to his application No. 708,820, which, as we have seen, was filed subsequent to Arnold's filing date. At the same time, Arnold moved that the interference be dissolved on the alleged ground that claims corresponding to the interference counts are unpatentable to Langmuir, in view of certain references which are said to be statutory bars against the divisional application of Langmuir, and which are said to be not bars against, and which do not anticipate, the Arnold patent involved herein. In connection with this motion, certain specified references are relied upon. The Law Examiner, after consideration of these motions, held that the alleged divisional application of Langmuir was entitled to the date of the parent case as to counts 1 to 11, inclusive, and 14, but not as to counts 12 and 13, as to which counts the motion to dissolve was allowed. This action was approved by the Examiner of Interferences. Thereafter the Examiner of Interferences awarded priority of invention to Langmuir, and the Board of Appeals affirmed this decision.

The first matter for consideration is the contention made by appellant that the claims made in the divisional application of appellee do not read upon the original claims in appellee's parent application of October 29, 1913, and that therefore the appellee is not entitled to any earlier date of disclosure and constructive reduction to practice than that shown by his divisional application, namely, April 24, 1924. In this respect it is claimed that in the said parent application Langmuir did not refer to the repeater which is connected between the oscillating generator and the load circuit as an asymmetric device, whereas, in the divisional application of Langmuir, and in the claims of Arnold in his patent, No. 1,485,156, this language is used. In reply to this suggestion, the Law Examiner and the Examiner of Interferences both held that the original disclosure of Langmuir in the patent application was sufficient upon which to base the divisional application; that an examination of the device showed by the drawings and described in the specifications in the parent application of Langmuir were sufficient to disclose that the said device had the inherent properties of an asymmetrically conducting repeater.

We have examined the drawings in both the parent application and the divisional application of Langmuir, and find that the drawing in the divisional application, figure 2, is exactly the same as the drawing accompanying the parent application. In the specifications in the parent application, the said repeater is referred to as an "electron discharge tube," while Arnold's and Langmuir's divisional application describe this device as being of the "audion" type. It is claimed by the appellee, and not controverted by the appellant, that the electron discharge tube and audion have the same functions, and are operated in the same manner. The mere use of the word "asymmetric" is not in itself enough to make a distinction between the divisional claim and the parent application. If it is plainly apparent from the drawings and specifications, when read in view of the knowledge of the art which the experts in the Patent Office are presumed to have, that the same disclosure was made in each case, in our opinion that is sufficient upon which to base a divisional application. If the invention was shown in the parent application of Langmuir, even though the particular use of it now made might not have been in his mind at the time, he is entitled to any use to which his invention might be put. It was said in Cleveland Foundry Co. v. De-

troit Vapor Stove Co. (C. C. A.) 131 F. 853, 858:

"This distinction harmonizes with the doctrine that the benefit secured by an invention extends to all the uses of which it is capable, whether the inventor had them all in contemplation or not, and the other rule, to which we have already referred, that it does not matter that he does not understand the principles on which his device operates. If he discovers new uses to which his invention may be put, or discerns the principles thereof more clearly, while his application is pending, in neither case is there any new invention, nor any enlargement of the old. And, that being so, there can be no legal objection to his so molding his claims as to secure all his invention discloses."

See, also, Dwight & Lloyd S. Co. v. Greenawalt (C. C. A.) 27 F.(2d) 823; Mershon & Co. v. Bay City B. & L. Co. (C. C.) 189 F. 741; Howe Mach. Co. v. Nat. Needle Co., 134 U. S. 388, 10 S. Ct. 570, 33 L. Ed. 963; Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267.

We agree with the Patent Office that appellee was entitled to make claims 1 to 11, inclusive, and 14, of his divisional application, and to take the date of the parent application, namely, October 29, 1913, for a constructive reduction to practice.

It is contended by appellant that Langmuir failed to make his divisional application from October 29, 1913, to April 24, 1924, and that this circumstance should be held to constitute laches and to bar his claim. Arnold obtained his patent in February, 1924, and Langmuir made his divisional claim about two months later. No abandonment or lack of diligence is alleged to have occurred during that period. Langmuir was within the two-year rule of the statute construed in Chapman v. Wintroath, 252 U. S. 126, 40 S. Ct. 234, 64 L. Ed. 491; Webster Elec. Co. v. Splitdorf Elec. Co., 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792; Westinghouse Elec. & Mfg. Co. v. Jeffrey, etc. (C. C. A.) 22 F.(2d) 277, and other cases.

Both of the Patent Office tribunals found that Arnold had established conception of the invention of counts 1, 2, 3, 4, and 11 prior to Langmuir's record date. This finding being favorable to appellant, of course is not questioned by him, and, in view of our conclusion as to the subsequent diligence of Arnold, the correctness of this finding is not material. Both tribunals held he had not been diligent from the time of this conception to Langmuir's record date. We concur in

this finding. We cannot improve on the statement of the Examiner of Interferences on this point:

"In considering whether or not any of the several experiments performed by Pierce amounted to a reduction of the invention defined by counts 1, 2, 3, 4 and 11 to practice the purpose of the invention must be taken into consideration. In the experiment, of which Exhibit 1 is the record, the testimony of Arnold and his witness Pierce is to the effect that the test had for its purpose to ascertain the characteristics of a certain audion detector tube. While the witnesses testified that they knew at that time that the audion tube had a high input impedance and was an asymmetrical device (Q. 20 of Pierce and Q. 5 of Arnold) the test of which Exhibit 1 is a record was not such as to constitute a reduction of the invention to practice. The experiment was not a test to determine whether or not a change in the load circuit or output circuit of the repeater would react on the generator to change its frequency. In this experiment Pierce did not actually measure the frequency of the oscillator or input to the audion detector. The different frequencies noted on the record, Exhibit 1, were taken from a calibrated oscillator (X Q. 51). The output circuit of the audion (the load circuit of the counts) was not varied in the experiment (X. Q. 53). There was no actual test of the invention here in issue. To hold that this experiment was a reduction to practice of the invention, because as Arnold contends, the function or characteristic of these tubes to prevent the reaction of the load on the generator is inherent in such tubes, would be in effect to hold that the invention belongs to that class in which an actual test is unnecessary."

The issue then squarely arises as to priority of conception of the subject-matter of counts 5, 6, 7, 8, 9, 10, and 14. We must look to the record testimony to discover just what the respective conceptions of the parties were. As has been stated, Langmuir offered no evidence, relying upon his record date. The evidence offered on behalf of Arnold was, in brief, as follows:

. Paul H. Pierce testified that he had been in the employ of the Western Electric Company and Bell Telephone Laboratories since July, 1911, and in 1913 set up and operated an arrangement of a generator, a three electrode vacuum tube, and an alternating current load circuit; that at that time he was working with Arnold; that on January 13th and 17th he took some frequency characteristics, using a Vreeland oscillator; that he was in that period continuously taking data on various audions; that he took complete measurements of input and output power with a three element tube connected to an alternating current with a Vreeland oscillator; that the Vreeland oscillator had a large bulb with one cathode in a pool of mercury and two anodes, with two coils on each side of the bulb so that the field of the coils was at right angles to the electron streams between the cathode and the anodes; that the frequency was determined by the tuned circuit between the two anodes, which consisted of the two coils on the sides of the bulb and a variable condenser, the capacity of which could be changed by a system of switches; that he was familiar with the operation of the Vreeland oscillator at that time, and Arnold was in charge of his work; that the oscillator used in these experiments was similar to the sketch, Exhibit 4, which was then offered in evidence; that the device used had a high input impedance and is an asymmetrical device, so that changes in the output circuit do not react on the input circuit; that he knew of the characteristics of the audion in January, 1913, from measurements which he was then making with Arnold; that Arnold was familiar with these; that he believed the results obtained were satisfactory, and that they were used in detailed studies of the audion characteristics which they were then examining; that Paul Clapp and he did work with a vacuum tube oscillator circuit coupled to an audion circuit, on the output of which was coupled the load circuit being measured, about May 13, 1914; that circuits involving oscillation generators of this type, followed by asymmetrical vacuum tube of the three electrode type, leading into alternating current of some sort, have been used in the laboratories of the Western Electric Company since 1913; that, in their experience, the output circuit of the audion did not vary and was not resonant to the frequencies applied to the input circuit.

Harold D. Arnold, the appellant, testified that he is employed by the Western Electric Company, reorganized as the Bell Telephone Laboratories; that during 1911 and 1912 he was studying the telephone repeater, using as a source of current some Vreeland oscillators arranged with a loosely coupled connection to secure frequencies which would remain constant, even though different amounts of current were drawn from them because of variations in the load; that his attention was called to the De Forest audion in the latter part of 1912; that the latter part of December, 1912, he found the input

impedance of these audions was of the order of a million ohms or more; that he then thought of attaching such a device to the output circuit of an oscillator by which there would be presented to the oscillator a practically unvarying high resistance, independent of the load applied to the output circuit; that early in January, 1913, he asked Mr. Pierce to continue this work, which he did; that this work was part of a general study of audions, and was done under his direction; that from 1913 to the end of 1917 such circuits were used rather frequently, and beginning in 1914, when their personnel on this work was considerably augmented, they were in practically daily use by a considerable number of people, which use has continued during the period mentioned; that the early uses of the invention were almost entirely in connection with circuits terminating in resistance or reactance loads and not in connection with radio; that they were working on telephony over wires.

Practically the whole controversy here revolves about the character of the experiments and the nature of the device used by Arnold and Pierce, as above set forth. If the appellant was then using in his experiments a device, the inherent qualities of which were identical with those of the Langmuir parent application, then he might well be said to be entitled to priority here. The Patent Office finds that the devices were not the same, and that therefore proof of conception by Arnold at that time is lacking, and that he must be relegated to his filing date for a date of conception.

In the fifth count of the interference, the device is described as "an oscillation generator of the audion type." Was Arnold's experimental apparatus of the audion type? The tribunals of the Patent Office say it was not. As shown by Exhibit 4, the oscillator used by Arnold and Pierce in their experiments consisted of a glass tube, evacuated, having three electrodes, one cathode immersed in a bath of mercury, and two anodes, these latter being plates located in arms extending outward in opposite directions from the base of the tube. Direct current electric power was connected with the cathode, and, by means of the apparatus described by Pierce and shown by Exhibit 4, oscillations were set up in the output circuit.

We agree with the tribunals below that this does not constitute an oscillator of the audion type. The word "audion" was registered as a trade-mark in 1916, registration No. 112,480, by the De Forest Radio Company, as a trade-mark for radio telephones and telegraph apparatus. But prior to that time, it was a word in quite common use, and was applied by L. De Forest as a name for the tube in his application for the basic patent on vacuum tube oscillators, No. 879,-532, patented February 16, 1908. Funk & Wagnall's New Standard Dictionary, 1925, thus defines the word. "Audion.—A small vacuum tube used to detect wireless waves."

The art, however, has given the word a somewhat more definite meaning, and, as so used, it is understood to mean a highly evacuated glass tube containing a cathode, usually a filament, capable of being heated by electric current, an anode or plate, to receive the current from the cathode, and an intervening grid or shutter, all of which are capable of connections outside the bulbs. By the use of the grid electrode, a controlling effect upon the discharge from the cathode is effected, so that potential variations applied to such electrodes will cause variations in the current flowing between the cathode and anode. The Thermionic Vacuum Tube and Its Applications, by H. J. Van Der Bijl (1920) p. 145; The Principles of Electric Wave Telegraphy and Telephone, by J. A. Fleming (1916) p. 537.

It requires no particular amount of knowledge of the art to observe that the device used by the appellant and pictured in figure 4 is not an audion, nor is it of the audion type. It has no heated cathode and no discharge controlling electrode. There is therefore no proof of any conception by Arnold of the subject-matter of count 5 in his experiments in January, 1913.

Counts 6, 7, 8, 9, 10, and 14 are each framed upon a generator which has an input and an output circuit, the output circuit reacting upon the input circuit. De Forest, in the specifications of his basic vacuum tube invention heretofore referred to, stated:

"I have determined experimentally that the presence of the conducting member a, which as before stated may be grid-shaped, increases the sensitiveness of the oscillation detector and, inasmuch as the explanation of this phenomenon is exceedingly complex and at best would be merely tentative, I do not deem it necessary herein to enter into a detailed statement of what I believe to be the probable explanation."

Following experimentation with the De Forest audion developed the fact that this device, when properly attached to input and output circuits, would feed back and build up electric frequencies received by it until they were greatly amplified. The present

day radio receiving and sending machines are the result.

Langmuir, in his original application, plainly disclosed such input and output circuits with his generator. It seems quite obvious to us that Arnold's oscillator or generator does not disclose anything of the kind. He did insert between his oscillator and his load circuit, in some of his experiments, a repeater with both input and output circuits. But his oscillator or generator had an output circuit only and was not capable of the reactive or amplifying feature of the Langmuir device. There is nothing to show that Arnold had a conception of this principle or function when he was making his experiments with Pierce.

This being our conclusion, it follows that Arnold must depend upon his record filing date of his conception. As this was subsequent to Langmuir's parent application and constructive reduction to practice, he must fail in his contentions here.

The decision of the Board of Appeals is affirmed.

Affirmed.