**ACME HIGHWAY PRODUCTS CORPO-RATION, Plaintiff-Appellant Cross-Appellee,**

v.

**The D. S. BROWN COMPANY and Delmont D. Brown, Defendants-Appellees Cross-Appellants.**

**Nos. 19910, 19952.**

United States Court of Appeals, Sixth Circuit.

Sept. 24, 1970.

Rehearing Denied Oct. 19, 1970.

John M. Calimafde, and Paul H. Blaustein, New York City, for appellant and cross-appellee, Sandoe, Hopgood & Calimafde, New York City, Richard B. Swartzbaugh, Swartzbaugh, Moor & Longthorne, Toledo, Ohio, on brief.

Matthew C. Thompson, Chicago, Ill., for appellees and cross-appellants, Lloyd C. Root, Johnston, Root, O'Keefe, Keil, Thompson & Shurtleff, Chicago, Ill., Robert B. Gosline, Shumaker, Loop & Kendrick, Toledo, Ohio, on brief.

Before EDWARDS, CELEBREZZE and BROOKS, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal from the United States District Court for the Northern District of Ohio, Western Division, of an action instituted by Acme Highway Products Corporation ["Acme"] against the D. S. Brown Company and Mr. Delmont D. Brown, charging the latter with infringement of Acme's patent on a preformed, neoprene device for sealing expansion seams and joints in highways. Brown and the Brown Company counterclaimed charging: that the patent was invalid; that Brown was a co-inventor and therefore entitled to manufacture, use, and sell the device; that by concealing Brown's status as a co-inventor, Acme, the patentee, was guilty of fraud upon the Patent Office; that Acme's use of the patent was in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (1964). The District Court held that the patent was invalid for more than one-year's prior use; that, in the alternative, Brown was a co-inventor; but that the defendants had failed to prove fraud upon the Patent Office or an antitrust violation. Acme appeals; Brown and Brown Company cross appeal.

I. The Patent In Suit

Modern highways are made of 15 to 100-foot-long concrete slabs spaced to allow for thermal expansion and contraction. The spaces between adjacent concrete slabs are called joints. In warm weather, due to expansion of the road surface, the sides of the joints are pushed together; in cold weather, the contraction of the road surface causes the sides of the joint to separate. In the absence of a joint sealing material, petroleum, brine, and other liquids enter the joint, eroding the subsurface, and causing the concrete slabs to collapse. In addition, sand, pebbles, and other incompressible debris falls into joints, inhibiting normal thermal expansion of the concrete, and causing it to erupt and crack.

Prior to introduction of the patented device, the most commonly used joint seal was a tar-based, liquid seal, poured or injected into the joint, which solidified upon curing. This seal, and similar ones made of plastics, were never satisfactory for more than one season of thermal cycling. In the heat of summer, the expanded concrete simply squeezed the sealant out of the joint. Tires of passing vehicles spread it over the highway surface. As the weather became cold, there was insufficient sealant left in the joint to fill it, the sealant became stiff, and would not adhere to the sides of the joints. Stones and incompressibles fell into the joints, and unless they were cleaned before the next warm season, the concrete ruptured where it could not expand. The cost of maintenance of highways was therefore high, and state departments of highways were anxious to find satisfactory alternatives.

In response to this need, many major manufacturers tried many different com-

positions of road seals, including pre-formed strips (*i. e.*, molded strips) of synthetic rubbers which were inserted between the walls of the joint rather than injected as liquids. The District Court found that none of these early plastic, tar, or pre-formed rubber seals worked satisfactorily.

To perform properly, a seal had to be able to exert a substantial and continuous lateral force against the sides of the joint over several years of thermal cycling; it had to resist the downward push of stones and automobile tires; it had to prevent the seepage of liquids into the joint; and it had to withstand exposure to the elements, and resist the corrosive influences of brine, ozone, and the by-products of petroleum combustion.

The patent in suit, United States Patent No. 3,179,026, was issued on April 20, 1965 to Alfred F. Crone, president of Acme. The patent describes, in general, a pre-formed strip of low-crystallization neoprene which, in cross-section, has a six-sided wedge shape. The strip is placed into the joint, and may be glued to its side. Although hollowed out, the seal has a unique internal configuration of neoprene ribs, which translate vertical forces on the seal into lateral forces to prevent upward or downward slippage of the seal within the joint. The low

crystallization material is capable of withstanding exposure not only to the elements, but also to vehicular exhaust, and it remains resilient after many seasons of thermal cycling and in cold weather. Because it exerts a substantial and continous lateral force against the sides of the joints, the seal prevents entry of liquids and pebbles. After some early testing, the patented device was selected for use and roundly acclaimed by the highway departments of many states. All experts who testified in the District Court acclaimed the device as a significant improvement over the prior art, and the District Court described its introduction as "an accomplishment hitherto unheard of."

## II. Validity

The District Court found that Acme's and Brown's sale, manufacture, and public use of the device for more than one year prior to the application for the patent, invalidated the patent, 35 U.S.C. § 102(b) (1964).[1] Acme argues that under 35 U.S.C. § 120 (1964)[2] the patent was entitled to the filing date of a parent application which was filed prior to any public use of the device. We find that the later application, which was granted, is entitled under section 120 to the filing date of the earlier, and that the patent in suit is valid.

---

1. 35 U.S.C. § 102(b) provides:
 "A person shall be entitled to a patent unless— * * *
 "(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."
 The novelty, utility, and obviousness of the Crone device are not raised as issues on this appeal; the District Court made no findings with respect to them.

2. 35 U.S.C. § 120 provides:
 "An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior appli-

cation, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."
Section 112, the first paragraph of which is incorporated by reference into section 120, provides:
 "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention. * * * *" 35 U.S.C. § 112 (1964).

On May 4, 1961, Mr. Crone filed a patent application on a device for sealing highway joints, and on a method for installing the device. Shortly after its filing, in response to a demand by the Examiner, Crone restricted his application to the device, and, apparently, abandoned the claims relating to the method of installing it. *See* 35 U.S.C. § 116 (1964); 37 C.F.R. § 1.141, et seq. Thereafter, the application was amended four times, new claims were added, and old ones modified. On April 8, 1964, in its final posture prior to abandonment, all claims of the application had been rejected by the Examiner; however, the Examiner indicated that one of the claims, *viz.* claim 17, "may be allowed" if it were amended to include certain functions which the Examiner found to be "inherent" in the unamended claim. It is unclear from the record of proceedings in the Patent Office that is before this Court, whether the application was expressly abandoned, or whether it was permitted to lapse for want of prosecution for a six-month period. *See* 35 U.S.C. § 133 (1964); 37 C.F.R. § 1.135 (a).[3]

■ In any event, prior to the abandonment of the parent application, on June 5, 1964, Crone filed a continuation-in-part application purporting to embody the same invention embodied in the parent. By this time, the Crone device had been on the market for more than a year. The continuation-in-part application met with greater success in the Patent Office than did its parent, and on April 20, 1965, a patent was granted upon it. The date of the patent related back to the time of filing of the parent application, *i. e.*, May 4, 1961.

It is well established that to come within the purview of section 120, a later application must: (a) disclose an invention which had previously been disclosed in the manner provided in 35 U.S.C. § 112 in an earlier application; (b) be by the same inventor; (c) be filed before the abandonment of the prior application; (d) expressly refer to the prior application. 35 U.S.C. § 120 (1964). *See* Bendix Corporation v. Balax, Inc., 421 F.2d 809, 816, 817 (7th Cir. 1970); Technicon Instruments Corporation v. Coleman Instruments Corporation, 385 F.2d 391, 393 (7th Cir. 1967) and cases cited therein. There is no dispute that, in the instant case, the second application was by the same inventor (Crone) as the first; that it was filed prior to the abandonment of the first application; that it specifically referred to the first application.

The sole issue is whether the continuation-in-part application discloses an invention which had previously been disclosed, in the manner provided by section 112, in the parent application.

The District Court held that the continuation-in-part application contained four features which were not present in the parent. Those features were considered to be:

"(1) Low crystallization elastomer material—claims 1–3 and 5–8 [of the continuation-in-part application];

(2) Low crystallization neoprene synthetic rubber—claim 4;

(3) A top wall comprising two downwardly inclined wall sections which are straight and each of which is thicker than the rib members; also straight wall sections which will deflect downwardly with minimum upward bulge when the side walls are compressed laterally—claims 2, 6 and 8; and

(4) Crossed diagonal support members or ribs of the internal truss structure making an angle of 30° with the side walls—claims 5–8."

In reaching this conclusion, the District Court restricted its comparison of the

---

3. Acme claims that the parent application was abandoned upon the advice of the Patent Examiner, in order to eliminate certain extraneous material. The reasons for the filing of the continuation-in-part, and for the abandonment of the parent are, however, irrelevant in a determination of whether the latter is entitled under section 120 to the filing date of the former.

two applications to the *claims* of each. In other words, features contained in the *claims* of the second which were not in the *claims* of the first were not deemed to be disclosed in the first. Thus, the District Court stated:

> "[T]here are two matters which are vital to the claims of the application for the patent in suit which are not common to the claims of the earlier application."

> "It is therefore the conclusion of the Court that the plaintiff is not entitled to the advantage of the original filing date, because the essential claims of the patent were not included in the claims of the original application."

In so limiting its inquiry, the District Court erred.

 The inquiry required by section 120 demands a comparison not only of the claims of the parent and continuation-in-part applications, but also of any other disclosures made in the applications. Thus, a feature claimed in the second application which was not claimed in the first, but which appeared in the specification or drawings of the first, is considered to be disclosed in each. An application effects a reduction to practice of everything disclosed therein, regardless of what is claimed. Chapman v. Wintroath, 252 U.S. 126, 137, 40 S.Ct. 234, 64 L.Ed. 491 (1920); Benedict v. Menninger, 64 F.2d 1001, 1003, 20 CCPA 1138 (1933); Arnold v. Langmuir, 36 F.2d 834, 835, 17 CCPA 756 (1930). Had the District Court compared the total disclosures of each application, it could not have reached the result it did.

First, the District Court held that the first application did not disclose a "low crystallization elastomer material" or "low crystallization neoprene synthetic rubber." This was clear error.

After mentioning that the failure of the prior art was its inability to retain its resiliency in cold and warm weather, the parent application stated (in its description of the invention):

> "These sealing members are preferably made of an extruded elastomer. However, it has been found that for most conditions the elastomer may be made of neoprene or a mixture of neoprene with other ingredients so that the material has a high resistence to deterioration by sunlight and materials which may be found on a pavement, such as salt, sand, calcium chloride and mineral oil. The composition of which the sealing member is made should be such that it will retain its elasticity and its ability to return to its original shape or into close resemblance thereto for a considerable number of years. Certain neoprene compounds are particularly well adapted to comply with these various requirements, but other elastomers may be employed if desired."

Mr. Crone admitted that at the time of the first application, he was not an expert in extruding neoprene or other elastomers. The disclosure above, however, makes it clear that he referred to a material capable of remaining elastic in cold or warm weather, resisting deleterious elements associated with highways, and mentioned specifically "neoprene."

Every expert who testified at the trial of this case indicated that if such a substance were described to him at the time of filing of the first application, he would have thought of a low crystallization elastomer such as neoprene. Indeed, Mr. Delmont D. Brown, himself, testified that he knew, upon first learning of the invention in 1960, that low crystallization neoprene was called for.

> "Q. Mr. Brown, did I understand your testimony correctly that you did think of low crystallization material at the outset in your initial discussions with Bryan [Acme's representative], or is your testimony that it was not considered by you as the right material for the job?

> "A. You are talking about April 15, 1960?

> "Q. That's right, yes, your first meeting. He said, 'I have a seal I

want you to make,' and told you the characteristics of the seal. Now, at that meeting after describing the characteristics to you, did you realize, because of your experience in this field, that he would require low crystallization neoprene?

"A. I think in my own mind that I concluded we would use low crystallization neoprene. However, whether I related this to Mr. Bryan or not, I doubt it.

"Q. And this was at the first meeting?

"A. Right.

"Q. And this was based on his description of the characteristics of the seal to you?

"A. Well, no. It was based on his outlining the problem in the field and he said that the seal had to function at low temperatures to keep the salt brine and material out of the joint and I figured that, if it has got to be flexible and effect a sealing pressure against the joint face at low temperatures, it should be crystallization resistant.

"Q. Well, this was the only material one would use for a road seal, would it not be?

"A. Well, apparently, because—

"Q. No; answer my question please. This would be the only material that a skilled person in this field would use for a road seal, would be the low crystallization; isn't that true?

"A. It should be."

■■■ The law is clear that subject matter may be added to an application by way of amendment or by a continuation-in-part application, without impairment to the right of the original filing date, where the added subject matter is

"something that might fairly be deduced from the original application." Cincinnati Rubber Manufacturing Company v. Stowe-Woodward, Incorporated, 111 F.2d 239, 242 (6th Cir. 1940); National Battery Company v. Richardson Company, 63 F.2d 289, 293 (6th Cir. 1933); United States Pipe and Foundry Company v. Woodward Iron Company, 327 F.2d 242, 247 (4th Cir. 1964). The evidence in this case leaves little question that a person skilled in the art of compounding and extruding elastomers, reading Crone's parent application in 1961, would have found low crystallization neoprene (or elastomer) to be inherent in its disclosures, and would not have had to undertake any independent experimentation in order to have done so.[4] See, e. g., Expanded Metal Company v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034 (1909). The District Court's contrary finding is clearly erroneous, and is reversed.

We now turn to the second group of differences the District Court found between the parent and the continuation-in-part applications. These are in the geometry of the seal itself. Again comparing only the claims of each application, the District Court found basic differences, which he considered to be essential to the validity of the patent.

Claims 2, 6, and 8(e) of the patent in suit describe a top wall comprised of two downwardly inclined straight wall sections which meet and are joined at their lower ends to form a central apex, said sections being thicker than the rib sections, so that they will deflect downwardly with minimum upward bulge when the side walls are compressed laterally. The function performed by this configuration, which the District Court found in the first application but not in the second, was that it prevented the

4. On December 19, 1967, the Brown Company was granted a patent on a highway and bridge joint seal similar to the one in suit, made of a low crystallization elastomer. It is evident from the patent that the Brown Company and the Patent Office considered the mere term "elastomer" a sufficient description of the composition of the seal, for a person skilled in compounding and extruding elastomers, for that is all that appears anywhere in the patent. U. S. Pat. No. 3,358,568, Elastomer Seal Strips for Moving Joints (filed May, 1964).

top wall of the seal from bulging upwardly, above the surface of the road, upon lateral compression of the seal.

We begin our inquiry with an examination of the structure of the seal as disclosed by the illustrations in the two applications. Figure A is a cross section of the seal which appears in the parent application; figure B is the continuation-in-part's illustration of a cross section of the seal; figure C shows the original seal under lateral compression; figure D shows the later seal under lateral compression.

The only apparent difference between figures A and B is the thicker top wall in figure B. The District Court held that this thicker top wall, which is claimed in the continuation-in-part application but not claimed in the parent application, is responsible for preventing bulge. Thus, the District Court held it a patentable difference.

██ A continuation-in-part application, by definition, contains a substantial portion or all of the earlier application plus additional, previously undisclosed, subject matter. A mere embellishment, or technical improvement, of a feature disclosed in the original application, which does not contribute to its novelty, utility, or non-obviousness, does not deprive a continuation-in-part application of its validity, or a patentee of the original filing date of the parent application. *See, e. g.,* United States Pipe and Foundry Company v. Woodward Iron Company, 327 F.2d 242, 247 (4th Cir. 1964). The Patent Office's judgment on such technical issues, *i. e.,* whether a modification is an embellishment or is of patentable importance, is entitled to special weight. Technicon Instruments Corporation v. Coleman Instruments Corporation, 385 F.2d 391, 393 (7th Cir. 1967); Baldwin-Lima-Hamilton Corporation v. Tatnall Measuring Systems Company, 268 F.2d 395 (3d Cir. 1959); Helms Products v. Lake Shore Manufacturing Company, 227 F.2d 677, 679 (7th Cir. 1955).

The description of the original invention discloses a top wall which does not bulge upwardly when the side walls are compressed:

"The sealing member 15 shown in Fig. 1 [figure A, above] is of a shape and cross section to provide maximum compression without destroying its ability to expand to its normal shape so that the sealing member will bear against the sides of the groove 12 during all of the changes in the width of the groove. ["Groove 12" and "groove" refer to the joint.] For this purpose the sealing member is provided with side walls 16 and 17 which terminate at their lower ends in a downwardly tapering V-shaped bottom wall 18 and at their upper ends in an upper wall formed in two halves 19 and 20 which converge downwardly toward each other and thus terminate in a slight depression or groove 21.

\* \* \* \* \* \*

"[W]hen the sealing member is compressed, as shown in Fig. 3 [figure C, above], the diagonally extending webs 24 will collapse into the relatively

large air spaces between these webs and the sides of the sealing member, and also the compression of the sealing member by the walls of the groove results in downward elongation of this member."

This description suggests that compression of the device in the parent application resulted in a "downward elongation" of the sealing member. Such downward elongation would create tension on the top wall causing it, also, to buckle downwardly. We need not rely totally on implication for this finding, however. Figure C, above, from the original application clearly illustrates it.

Furthermore, the Patent Examiner, who qualifies as one "skilled in the art," Williams Manufacturing Company v. United Shoe Machinery Corporation, 121 F.2d 273, 277 (6th Cir. 1941), suggesting changes in wording in the parent application prior to its abandonment, found an "inward tension" on the top wall to be "inherent" in the disclosures of the parent application. Responding to the last proposed amendment to that application, he stated:

"A claim such as claim 17 when amended as follows, may be allowed. In claim 17, line 12, after the comma, insert—at least one pair of—, and cancel 'some of said.' In lines 20 and 21, cancel the portion beginning with 'at least,' and ending with 'bottom walls,' and substitute—a pair of diagonal webs being connected to said side walls above said cross webs and to approximately said longitudinal center of said upper wall—. In line 22, continue the sentence with—and inward tension on said center portion of said top wall to prevent bulging of said top wall—. The specification should be amended to incorporate this latter function which is considered inherent."

Thus, it was obvious to the Examiner that the original application disclosed a seal geometry having the function of preventing bulge by means of a downwardly converging top wall. That the later application specified the precise angle of the ribs to the side walls, i. e., 30°, was immaterial to the Patent Office, probably because the illustrations reproduced in figures A and B, above, show those angles to be nearly identical in the parent and continuation-in-part applications.

■ Thus, after two sets of examinations, one in relation to the original application, and several in relation to the continuation-in-part application, the Patent Office found that the seal geometry, as opposed to the thicker wall of the later application, was responsible for preventing bulge. The Patent Office did not deem this new matter either in its examination of the parent or in its examination of the continuation-in-part application in light of the parent. Their finding was entitled to special weight, which the District Court did not accord. We find the District Court's findings of differences between the seal geometry disclosed in 1961 and 1964 to be clearly erroneous.

■■ Upon review of the record in its entirety, we find that all claims of the Crone patent are valid, and that the patent is entitled, under 35 U.S.C. § 120 (1964) to the filing date of the parent application.

### III. Joint Inventorship

The remaining issues on appeal may be disposed of summarily. All depend upon a determination whether Brown was a joint inventor, entitled to use, manufacture, and sell the patented device. Finding that he was not, we need not reach the issues of fraud upon the Patent Office or antitrust violations.

Upon this issue, the District Court held that a preponderance of the evidence established that Brown was a joint inventor with Crone.

"The defendant D. S. Brown contends that if the patent in suit is valid, he is actually a co-inventor with Mr. Crone, the plaintiff's president. The evidence which was adduced on this point was in square conflict, and

in its essentials, ultimately comes down to a determination of the credibility of witnesses, principally the defendant D. S. Brown, as against the plaintiff's Vice-President, Freel Bryant, and President, Alfred F. Crone. There was considerable documentary evidence offered both to support and contradict the testimony of these witnesses, but the probative value of some of the evidence is open to large questions. A good deal of it was of a type that could easily be manufactured or altered to meet the necessities of proof, so much so that probably even an expert examiner of questioned documents would be unable to say whether it was genuine or tailored to the occasion.

"This Court, of course, had the advantage of having the witnesses before it, and saw and heard them as they testified. The documents, also, have been carefully examined, reviewed, and weighed in the context of all the evidence. The *preponderance of the evidence* leads to the conclusion that the final design of the highway seal was the joint product of the efforts and ideas of D. S. Brown, Freel Bryant, and Alfred S. Crone, and that Brown must be considered as a co-inventor of the patented seal." [Emphasis added.]

Further emphasizing the standard of proof he applied on the issue of joint inventorship, the District Court stated:

"While this Court finds that a preponderance of the evidence establishes the credibility of the defendant D. S. Brown's version of the disputed facts, and casts doubt upon the testimony and exhibits that conflict with it, this is far from saying that the evidence is clear and convincing about either side's version of these matters."

In applying the preponderance of the evidence rule, the District Court erred.

The fact that a patent was issued in the name of Alfred F. Crone, as sole inventor, is *prima facie* proof of that fact. The burden upon Brown in making an assertion to the contrary of this presumption is very high. The temptation for honest witnesses, who have worked years with a patentee to implement his ideas, to forget whose ideas they were, is very strong. For this reason, it has been well established that joint inventorship must be proven by clear and convincing evidence. Pointer v. Six Wheel Corporation, 177 F.2d 153, 157–158 (9th Cir. 1949), cert. denied, 339 U.S. 911, 70 S.Ct. 570, 94 L.Ed. 1338 (1950); Agawam Company v. Jordan, 7 Wall. 583, 19 L.Ed. 177 (1868); I Deller's Walker on Patents §§ 39–43 (2d ed.1964). *See* Eibel Process Company v. Minnesota & Ontario Paper Company, 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523 (1923); The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.), 143 U.S. 275, 284–285, 12 S.Ct. 443, 36 L.Ed. 154 (1891); Webster Loom Company v. Higgins, 105 U.S. 580, 581, 26 L.Ed. 1177 (1881). Since the Appellees did not advance clear and convincing proof of joint inventorship, they did not meet their burden.

### IV.

The judgment of the District Court is reversed, and this cause is remanded for proceedings consistent with this opinion. Costs on appeal are taxed against the Defendants-Appellees.