BLISS & LAUGHLIN INDUSTRIES,
INC., Plaintiff,

v.

BIL–JAX, INC., Defendant.

Civ. No. C 71–45.

United States District Court,
N. D. Ohio, W. D.

May 15, 1972.

Thomas Maguire, Toledo, Ohio, and William E. Lucas, Malcomb McCaleb, Chicago, Ill., for plaintiff.

Allen D. Gutchess, Jr., Toledo, Ohio, and David P. Rupp, Jr., Archbold, Ohio, for defendant.

OPINION

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DON J. YOUNG, District Judge:

This is an action in which the plaintiff claims that the defendant is infringing U.S. Patent No. 3,190,405 for an extendable shore. This patent was originally issued to R. K. Squire, and later assigned to the plaintiff. The plaintiff seeks an injunction restraining the defendant from further infringing the patent, and damages for the past infringement.

The defendant denies both the validity of the patent, and that it has infringed it, and by counterclaim seeks a declaratory judgment of invalidity and non-infringement.

The matter was heard upon the issues of validity and infringement, with any issue of damages being reserved for further hearing.

As patent cases go, this one appears to be rather simple. The patent in suit deals with shoring scaffolding. As distinguished from ordinary scaffolding, which is designed and intended only to support workmen, materials and equipment, none of which is very heavy, shoring scaffolding is designed to carry very heavy loads when building structures of concrete, especially bridges and large buildings such as sports arenas and public buildings.

The application for the patent in suit was filed June 30, 1961, and the patent was issued June 22, 1965. It was agreed that only claims one, two, five, six, and seven of the patent are involved in the present dispute. It was stipulated that the plaintiff is the owner of the patent in suit, with all rights to recover for past infringement thereof.

The evidence showed that the use of shoring scaffolding did not become commercially of any great importance until in the nineteen-fifties, and that great impetus to its use was given by the federal interstate highway programs.

R. K. Squire, the patentee of the patent in suit, had developed a considerable business in this area in the western states doing business as Superior Scaffold Company. The plaintiff was and still is one of several manufacturers who sell and lease scaffolding, as is the defendant, and another concern known as the Safway Steel Products Company. This last company was later purchased by A–T–O, Inc.

Sometime in early 1965, the Superior Scaffold Company licensed Safway Steel Products to manufacturer, sell, and lease the scaffolding made under the patent in suit, which was being marketed under the trade name of "Shore-'X'". Late in 1967 the plaintiff bought all of the outstanding stock of Superior Scaffold Company, and thus became the owner of that corporation and all its assets, including the patent in suit. Thereafter the plaintiff extended for a limited time the license to A–T–O, Inc., as successor to Safway Steel Products.

A man named Leonard C. Ellis was employed by Safway Steel Products from 1962 until the end of November, 1968, as a salesman. As such, he had secured large contracts for the leasing of shoring scaffolding for a new post-office being constructed in Richmond, Virginia. His employer apparently did not have available as much Shore-"X" scaffolding as was necessary on that, and apparently other, large projects. Ellis left his employer and went into business for himself. To do so, he needed scaffolding which could be used interchangeably with the Shore-"X" scaffolding. He engaged the defendant to manufacture various components of scaffolding which could be so used.

Essentially the Shore-"X" system, which is described in detail in the patent in suit, consists of base units four feet wide and six feet high, extension units four feet wide and five feet high, the legs of which slide into the legs of the base units, cross-braces, and adapter pins. There are other components of the system which are of no consequence.

The extension units have so-called "tie-pins" at the top outside. The base units also have tie pins at both top and bottom inside. The adapter pins fit into evenly spaced holes in the legs of the base unit. The tie pins and adapter pins are connected by the cross braces. Whether the extension units are raised to their highest elevation, or lowered to their lowest elevation, the distance between the tie pins and adapter pins remains constant. Thus it is possible to erect support scaffolds of varying heights, always very strongly cross-braced with superior load carrying characteristics, and using cross-braces of uniform length.

Before this system was invented by Mr. Squire, the patentee, it was necessary to have scaffolding units of many different sizes in order to have sufficient load-bearing capacity. The idea of telescoping extension scaffolding was not novel, but it was impractical for heavy load-bearing, as the capacity decreased very rapidly as the extensions were drawn out to their full height. The Shore-"X" system would carry ten percent more load with twenty percent less scaffolding, and is much more quickly erected and adjusted than the types in use before it was developed. The essential cross-bracing is much simpler and more effective than any previous types of scaffolding.

In order to avoid the appearance of infringing upon plaintiff's patent, the units manufactured and sold by the defendant were slightly different than those described in the patent. There is only one tie pin on the top of each leg of the extension units instead of two. The adapter pin has only one exterior pin protruding instead of two. The holes in the base unit are drilled at right angles to the plane of the unit, instead of being drilled in that plane.

It is clear beyond question that the placement of the holes on the front rather than on the edge of the base unit makes absolutely no difference in the function. It is equally clear that the lack of tie pins on the extension units and adapter pins does not in any way prevent these items from being used interchangeably with Shore-"X" components. All that it does is to make impossible the use of end cross-braces.

The defendant offered in evidence photographs and corresponding drawings illustrating a number of ways in which the units which it manufactured and sold to Mr. Ellis could be assembled so that the claims of the patent in suit would not read upon them. It is, however, clearly apparent that most, if not all, of such uses are unstable and incapable of bearing safely the heavier loads which the patented scaffolding is designed for.

The defendant offered some prior art patents and uses which it claims antedate the patent in suit, and were not considered by the patent examiner in the issuance of the patent in suit. The greatest emphasis was upon the Higgs patent, British patent No. 338,711, and the Carrick patent, U. S. patent No. 591,208. There was also some reference to the Schieffer patent, British patent No. 493,181, and a device illustrated in a magazine article published in March, 1960, defendant's Exhibit S.

It is clear that all of these patents and devices are essentially irrelevant to the patent in suit. It is, of course, true that all of them use telescoping extensions to vary the height of the scaffolding, but the patent in suit itself points out that this is not a novel idea. The Higgs and Schieffer patents are concerned primarily with folding scaffolding for supporting workmen. They obviously could not be, and were not intended to be, shoring scaffolding. The Carrick patent is not for scaffolding at all, but is a sort of adjustable trestle or sawhorse.

Defendant attempts to demonstrate that by combining the Higgs and Carrick patterns, as in its Exhibits J and K, a device can be created which bears some superficial resemblance to the patent in suit. However, the essential feature of the patent in suit, the intercon-

necting of the pairs of base frames and extension frames by cross-braces of standard length to form a completely rigid structure capable of considerable variation in height without any loss of strength, is neither illustrated nor claimed in any of the alleged prior art patents, or in the device shown in the magazine article. The latter device particularly is subject to the deficiency that the patent in suit eliminates, that of increasing loss of load bearing strength as it is extended.

■ It is elementary that in order to be valid, a patent must combine the three elements of novelty, utility, and non-obviousness. 35 U.S.C. §§ 101, 102(a), 102(b) and 103. A patent once issued is presumptively valid. 35 U.S.C. § 282. This presumption of validity may be overcome only by proof by clear and convincing evidence. Acme Highway Products Corp. v. D. S. Brown Co., 431 F.2d 1074 (6th Cir. 1970), cert. denied, 401 U.S. 956, 91 S.Ct. 977, 28 L. Ed.2d 239 (1971).

The rule for determining non-obviousness has been laid down by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1965). Under that rule, as applied to the evidence in the case, there can be no doubt that Mr. Squire's invention was not obvious. The alleged prior art patents did not hint at it, and the practice in the field had been the ancient one of piling various sized blocks one upon the other to reach the desired height. Attempts to use telescoping extensions or long jack-screws were unsuccessful, because the lack of effective and readily variable, but rigidly interconnected, cross-braces made them too unstable for successful load bearing. The idea was wholly novel, simple as it may seem once Mr. Squire hit upon it. There is no attempt to dispute its utility. The record contains many illustrations of this, both in the form of testimony and exhibits. Some of the exhibits even show clearly the units made by the defendant attached to units made under license from the plaintiff.

■ It is clear that the patent in suit meets the statutory requirements for validity.

The defendant also claims that the language of the patent claims is indefinite, ambiguous, and uncertain and that new matter was introduced into the claims during the prosecution of the application for the patent. By this, the defendant is referring to the words "standard length" or "standard effective length". It is clear, however, that the language complained of is in no way indefinite, ambiguous, and uncertain when read in view of the file history and the problems presented by the prior art patents. Those which most closely resembled the invention claimed relied on extensible braces, or braces of different lengths to be used with different extensions. It is apparant from the original application that one of the basic claims involved was the elimination of complicated bracing problems by the use of a single set of braces of uniform length. The defendant's argument on this point is a quibble which requires no further consideration.

The Court is compelled irresistibly to the conclusion that the patent is valid.

Nor is there any greater difficulty in reaching the conclusion that it was infringed.

■ The defendant claims that it is not a direct infringer under the provisions of 35 U.S.C. § 271(a), because the patent is for a combination of elements and that it made only components of scaffolding but did not sell the components in an assembled relationship. The evidence, however, reveals that the defendant made and sold every single item necessary to complete the patented combination of elements, knowing that the components it manufactured were to be used interchangeably with other components manufactured and sold under license from the patentee. To say that such activity does not come within the statutory proscription of making, using, or selling any patented invention is to torture language beyond any semblance

of meaning. Nor can the defendant escape through the language of the Supreme Court in Aro Mfg. Co. v. Convertible Top Co., 365 U.S. 336, 344, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) that the combination patent covers only the totality of the elements in the claim and that no element separately viewed, is within the grant, for the defendant here manufactured the totality of the elements in the claims.

Certainly the defendant is at the very least liable as a contributory infringer under 35 U.S.C. § 271(a), which prohibits selling components knowing them to be especially made or especially adapted for use in an infringement of such patent.

■ True, defendant attempts to escape from this provision by reliance on the exception for staple articles or commodities of commerce suitable for substantial non-infringing use. Certainly the components sold here were no staple article of commerce. Although defendant had been making scaffolding for years, and had a standard catalog of its goods, the items involved here were not listed in it, nor made by defendant, until Mr. Ellis prevailed upon defendant to make the infringing articles. Nor is there a scintilla of evidence that any other manufacturer in the business or out of it was making such components. In its dictionary meaning, the word "staple" means:

> "A commodity that is produced regularly or in large quantities esp. for a wholesale market." Webster's Third New International Dictionary, 2225 (1965)

There can be no possible extension of this definition to encompass the articles which the evidence shows the defendant to have made and sold.

■ Nor were they, contrary to defendant's contention, suitable for a substantial non-infringing use, in spite of defendant's efforts previously discussed to show them so. They could perhaps be used otherwise than in the patented combination to prop up light loads, but their efficiency would decline, and the risk involved in using them would increase, as they were extended to greater heights and burdened with heavier loads.

■ Defendant also claims that it cannot be a contributory infringer because its customer, Mr. Ellis, was not an infringer, since he purchased scaffolding components from a distributor for a licensee under the patent in suit. This is claimed to give Mr. Ellis an implied license to buy and use infringing components in combination with the legitimate components. Thus stated, the fallacy of this contention is too clear to require further comment.

This Court entertains no doubt upon the evidence which was before it that the plaintiff's patent No. 3,190,405 is valid, and that the defendant has infringed it. The plaintiff is entitled to an injunction as prayed for, and the cause will be continued for hearing upon the issue of the amount of damages to which the plaintiff may be entitled. The defendant's counterclaim will be dismissed.

This Court is of the opinion that an order expressive of these findings and conclusions involves controlling questions of law as to which there are substantial grounds for difference of opinion and that an immediate appeal therefrom might materially expedite the termination of this litigation.

This opinion will serve as the Court's findings of fact and conclusions of law. Plaintiff shall prepare and submit an order in accordance therewith as provided by the Rules of this Court.