**TELEDYNE MID–AMERICA CORP.,**
**Plaintiff, Appellant,**

v.

**INTERNATIONAL TELEPHONE &**
**TELEGRAPH CORPORATION,**
**Defendant, Appellee.**

**No. 71–1164.**

United States Court of Appeals,
First Circuit.

Oct. 7, 1971.

Richard Bushnell, Chicago, Ill., with whom Richard A. Giangiorgi, Chicago, Ill., A. Lauriston Parks, Providence, R. I., and Olson, Trexler, Wolters & Bushnell, Chicago, Ill., were on brief, for plaintiff, appellant.

Dana M. Raymond, New York City, with whom George M. Vetter, Jr., Robert Neuner, and Brumbaugh, Graves, Donohue & Raymond, New York City, were on brief, for defendant, appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

This is an action for infringement of Patent No. 2,867,001, issued to E. H. Lewis et al. January 6, 1959. The district court, in an extensive and considered opinion, 325 F.Supp. 424, held the patent invalid for a number of reasons, including indefiniteness, and for this last reason found, alternatively, that plaintiff had failed to prove infringement. We affirm.

There is a commercial need for a marking device to imprint or emboss information upon the surface of a rubber- or synthetic rubber-coated electric cable. Because of the rough usage that some cable is given, it is desirable that the marking be molded into the cable, to retain its clarity. The resilient nature of the outer coating, or sheath, makes such marking impossible in its finished state; the stamping must be accomplished during or before the vulcanization, or curing. Before Lewis[1] this was accomplished in rather cumbersome and expensive ways. In Lewis a marking wheel is used to stamp the sheath by contact during the vulcanization process. The normal method of applying the sheath is to draw the internal, already insulated, wires through a device which, by an extrusion process, applies a coating in plastic form. The cable then proceeds through an elongated tube, where it is exposed to live steam which cooks the coat to the required firmness. The wire moves continuously through the tube, which may be 200, or even 300 feet long, so that a given point in the cable may take several minutes to traverse it. Lewis' original application gave no location for the wheel within the tube except to say that it must make contact "while the material is in a plastic state." The examiner rejected all claims, stating that, given prior art showing marking wheels and continuous vulcanizing devices, it was obvious simply to place a marking wheel within the tube. After some remonstrance Lewis accepted this rejection, and set about defining a more precise location. His initial attempts ran into assertions of indefiniteness by the examiner. After further revisions, seven claims were accepted. The typical claims, upon which plaintiff principally relies, are No. 3 (method), and No. 6 (mechanism), appearing in full in an appendix, post.

The district court found that Lewis, by these substituted claims, gave up, and by virtue of file wrapper estoppel, forever gave up, the outmost portions of the total area in which, physically, the material remained sufficiently plastic to receive the imprint, restricting the location of the wheel to a more limited and more narrowly defined space. It then found, on the basis of the evidence, that it was impossible, in practice, to ascertain these limits, and hence impossible to apply the definitions of the claims, making the patent invalid for indefiniteness, and, correspondingly, making it impossible to determine whether the de-

---

1. We will assume, for present purposes, that defendant failed to meet the heavy burden of establishing alleged third party prior use. *See* Washburn & Moen Mfg. Co. v. Beat 'em all Barbed Wire Co., 1892, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154.

fendant had placed its wheel so that it infringed. Plaintiff appeals.

■ The principle of file wrapper estoppel, although easy to state, is not always easy to apply. Simply stated, it estops the patent holder from interpreting the patent in a manner that resurrects from his initial application language, claims or equivalents which were given up in negotiations with the examiner. *See* Borg-Warner Corp. v. Paragon Gear Works, Inc., 1 Cir., 1965, 355 F.2d 400, 405–406. However, there is always a possibility that, in fact, it was ultimately the examiner who abandoned a position, not the applicant. The area which the Lewis patent purports to define commences a distance in the tube from the extruder, after a "minor interval" of "pre-roller engagement steam treatment," and terminates at a point immediately prior to "actual vulcanization." With respect to the latter, if the question were determinative, we might wonder whether it is possible to read the added description of the maximum permissible distance away from the extruder as any different from the original claims, and whether it was not the examiner, rather than the applicant, who renounced any objections he may have had regarding this point. However, we could not possibly say that the court erred in the other direction, in finding that Lewis restricted the commencement point by placing the wheel at a distance removed from the extruder. We develop this matter more fully in the appendix to this opinion.

In sum, in response to objection that more defined specifications, and hence less obvious benefits, were called for, Lewis amended his introductory specifications to provide for the material to receive some amount of treatment by the steam before the imprint should be made, and limited his claims, accordingly, to permit "a minor period of exposure" before contact. At the trial it developed that this point could not be determined, scientifically or otherwise. We believe that this is fatal.

Whether a formula or engineering means of determining the method of application of the teachings of a patent is necessary depends upon the circumstances. We would agree with the plaintiff, for example, that had the patent been granted upon the original claims, which merely called for placing the wheel wherever the material retained sufficient plasticity to receive and retain the imprint, it would be unimportant that this area could be found only by experimentation. Such could be readily accomplished. Plaintiff's difficulty in the present case is that the excluded "minor period of exposure" viz., the interval needed to receive the beneficial density-producing effects of the steam, cannot be determined even by experimental means. This its own expert conceded.[2]

Furthermore, it cannot be concluded that awaiting this exposure produces any benefits. Defendant's wheel is located only 15 inches from the extruder, about as close as it is mechanically practicable to place it. Hence its entirely satisfactory imprint either occurred before the steam had had time to have any effect upon the coating—a conclusion supported by defendant's testimony that the imprint could be successfully made even when there was no steam in the tube —or the effect of the steam was so instantaneous that a machine which placed the wheel adjacent to the extruder necessarily received the benefit of the patent's specified minor interval, so that the supposed invention was of no conceivable consequence.

■ Plaintiff is accordingly in this posture. Lewis was refused a patent in which the wheel was placed indiscriminately in the tube wherever the sheath-

---

2. "Q. Is there any known way of determining whether the cable is softer at one foot from the extruder than it was at the moment that it came out of the extruder, or harder? A. I know of none.

Q. Is there any known way of determining whether the cable sheath is more dense or less dense at that point? A. I know of no way."

ing retained sufficient plasticity to take the imprint, because this was obvious, and was told that he must contribute something by narrowing the area of application. He acquiesced and purported to do so. It now appears either that the narrower area that he designated is impossible of discovery, or that narrowing the area contributed nothing of consequence to public knowledge. Hence the patent must be invalidated for failure to disclose how it is to be applied, 35 U.S.C. § 112, or for want of invention, 35 U.S.C. § 103.

We need go no further. The judgment of invalidity is affirmed.

### APPENDIX

In response to objections by the examiner the applicant changed certain connecting prepositions and added to the original introductory specifications further details, including the words italicized in the following excerpts from the patent as issued.

"In carrying out the invention the sheathed conduit C *shortly after* entering the vulcanizing chamber is passed between the peripheries of a pair of contiguous metallic rollers. * * * The rollers F—G are carried on suitably supported shafts I—J and are positioned within the steam chamber in such proximity to the discharge end of the extruder E that the advancing extruded sheath D in its plastic state will be subjected *to an outer body plasticity reducing and density increasing action by the vulcanizing* steam in the chamber A as it travels from the extruder to the rollers. * * * *The pre-roller engagement steam treatment of sheath D therefore results in better roller die compacting of the body.*"

Consistent with the substance of this added disclosure new claims were substituted. These allowed claims in effect repeated original claims, but added the italicized words.

"3. The method of forming indicia on the surface of a vulcanizable sheath of a continuous product consisting in extruding the sheath in a plastic state into an atmosphere of vulcanizing heat and pressure, and *after a minor period of exposure* of the conduit sheath to said atmosphere as compared to the period required to sheath vulcanization *and not earlier than about the moment sheet surface vulcanization commences*, the step of molding indicia of substantial thickness on the surface of the sheath under pressure while the sheath is in such atmosphere and while in its plastic state by means of a die heated to a vulcanizing temperature, and thereafter completely vulcanizing the sheath throughout."

"6. In a mechanism for vulcanizing indicia on the sheaths of conduits, the combination of a walled vulcanizing chamber having a conduit entry and exit in opposite walls, an extruder for molding a plastic sheath on a conduit and directing the assemblage through said chamber, and metallic rolling indenting die arranged in said chamber engageable with said sheath to form indicia on the surface thereof under heat and pressure as the assemblage is advanced through said chamber, and *said indenting die being spaced from the conduit entry such a distance that outer sheath body plasticity will be decreased and its density increased by vulcanizing chamber action but without actual vulcanization taking place prior to action of the die*, whereby better die-produced compacting of the sheath body at the site of and inwardly of the indicia walls will be effected."

Any ambiguity there might be thought to be in this language must be construed in the light of the specifications, *cf.* Wilson Research Corp. v. Piolite Plastics Corp., 1 Cir., 1963, 327 F.2d 139, 140, particularly in view of the reason for the addition.