**DALE ELECTRONICS, INC.**

v.

**R. C. L. ELECTRONICS, INC.**

Civ. A. No. 3295.

United States District Court,
D. New Hampshire.

March 22, 1973.

See also D.C., 53 F.R.D. 531

1118

Martin L. Gross, Sulloway, Hollis, Godfrey & Soden, Concord, Donald H. Zarley, Zarley, McKee & Thomte, Des Moines, Iowa, for plaintiff.

E. Paul Kelly, Sheehan, Phinney, Bass & Green, Manchester, N. H., Arnold Sprung, Burgess. Dinklage & Sprung, New York City, for defendant.

## OPINION

BOWNES, District Judge.

This is a patent infringement case. Plaintiff, Dale Electronics, Inc., is a Nebraska corporation with a principal place of business at Columbus, Nebraska. Defendant, R. C. L. Electronics, Inc., is a New Jersey corporation doing business in Manchester, New Hampshire. Jurisdiction and venue are based on 28 U.S.C. §§ 1338(a) and 1400(b).

The defendant is accused of infringing four patents held by the plaintiff:

1. Number 3,295,090 (hereinafter 090) filed February 26, 1962, and granted December 27, 1966;

2. Number 3,201,855 (hereinafter 855) filed February 21, 1961, and granted August 24, 1965;

3. Number 3,206,704 (hereinafter 704) filed November 19, 1962, and granted September 14, 1965; and

4. Number 201,884 (hereinafter 884) filed July 3, 1963, and granted August 10, 1965.

B. F. Hay is the claimed inventor of patents 090, 855, and 704.

All four patents are concerned with electrical resistors. The first three pat-

ents have to do with the method of making electrical resistors. The fourth patent covers an aluminum housing for such resistors. For purposes of this case, electrical resistors consist basically of a core, a wire which is wound around the core, and an insulative material enclosing the wire-wound core with terminal and lead wires protruding from both ends of the core and insulative material. Such a resistor may or may not be enclosed in an aluminum housing.

## THE 090 PATENT

### A. VALIDITY

The validity of the 090 patent is challenged on four grounds:

1. That the prior art made the subject matter obvious, 35 U.S.C. § 103;

2. That the claimed inventor did not invent the subject matter sought to be patented, 35 U.S.C. § 102(f);

3. That the specifications do not meet the requirements of 35 U.S.C. § 112; and

4. Fraud and misrepresentation on the Patent Office.

 I address myself first to the question of obviousness in the light of the prior art. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), is the definitive case in this area. Certain basic factual inquiries are to be made:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these

inquiries may have relevancy. At pages 17–18, 86 S.Ct. at page 694.

The core of the 090 patent is the use of beryllium oxide of at least ninety percent purity as the core of the resistor. The claim states:

I claim:

In an electrical resistor having a core element with high heat dissipating properties,

an elongated straight cylindrical insulative core of solid and homogeneous construction, and being comprised substantially of beryllium oxide,

said beryllium oxide comprising at least 90 percent by weight of said insulative core, . . . . Column 3, lines 33–40.

The plaintiff was the first to use beryllium oxide as a core in electrical resistors. Its success was almost instantaneous and widespread. There are two reasons for this. One is the fact that beryllium oxide of a high purity, i. e., over ninety percent, has the rare quality of being both an insulator and a conductor. Since the wire-wound core of a resistor, by its very function, builds up heat in the process of resisting the flow of electricity through it, the heat must be dissipated or else the core will burn out. An industry-wide problem was that resistor cores developed "hot spots" due to heat build-up. This weakened the resistor and shortened its life. Since a core made of beryllium oxide disperses the heat over a large area, this reduces or eliminates the "hot spot" problem, keeps the core cooler, and results in it having a longer and more useful life. (Pl. Ex. 123). The heat dissipation properties inherent in beryllium oxide means that beryllium oxide cores can be used effectively at higher temperatures than the traditional ceramic cores that had been in use in the industry.

The second property of a beryllium oxide resistor core that contributed to its widespread demand was that its combined insulative and heat dissipative

characteristics permits reduction in its size without materially affecting its capacity. This fitted into the miniaturization revolution in the electronics industry in the 60's.

The use of beryllium oxide as the core of a resistor thus meets the *John Deere* tests of commercial success and long felt but unsolved needs. But these are only part of the requirements for nonobviousness.

The most important line of inquiry is directed to the prior art.

### 1. The Prior Art

Two prior art patents bear directly on the issue. The so-called Von Wedel Patent (No. 2,075,876) is dated April 6, 1937. Page 2, lines 47 to 54 of this patent points, although in a wavering fashion, to the use of beryllium oxide for a similar purpose.

> I have found that certain compound such as beryllium oxide and aluminium which do not have high electron emission, when mixed with sintering materials, such as the fluorides, for example, strontium fluoride, form admirable insulating coatings for such twisted wires operating at the high temperatures required.

One of the claims of the Lindenblad Patent (No. 2,734,344), dated February 14, 1956, is the use of beryllium oxide as an insulative core in the annular members of an electric cooling apparatus. (Deft. Ex. A-1-36, Col. 6, line 24). There were a number of scientific articles available in the 1950's explaining the properties of beryllium oxide and how it could be used as a combination insulator and conductor with various electrical devices. (Deft. Ex. A-1, 2-12).

The crucial aspect of the prior art, however, lies not in patents and scientific articles, but in the manner in which the inventor, B. F. Hay, came to use beryllium oxide and what prompted him to do so. Mr. Hay's first contact with beryllium oxide as a core substance in electrical resistors resulted from a conversation with a salesman of Frenchtown Porcelain Company which was supplying ceramic cores to the plaintiff. After making a cursory examination of the literature available on beryllium oxide, Mr. Hay ordered cores made of beryllium oxide from Frenchtown, but cancelled the order after the price list became available because the high cost made their use impracticable. It must be pointed out here that up until about 1960, beryllium oxide was too expensive for use in resistors. Part of the reason was due to the fact that its handling posed serious dangers of poisoning. (Dep. of Risk, page 72, Testimony of Altieri). In August of 1961, Hay's attention was again drawn to the use of beryllium oxide as resistor cores at a trade show in San Francisco. As a result of what he saw, he ordered sample cores made of beryllium oxide from the National Beryllia Corporation. The cores were really rods of beryllium oxide of high purity made to plaintiff's size specifications. The inventor had nothing to do with the composition of the rods and how they were manufactured, nor does the patent so claim. Starting in the late 50's, the National Beryllia Corporation published a great deal of material aimed at the electronics industry to promote and expand the use of beryllium oxide. (Deft. Ex. A-1, 58-65). A striking example of what must be termed prior art is an ad by the National Beryllia Corporation in the June, 1959, edition of the trade journal "Ceramic Age." The ad states in part:

> For design, development engineers and producers of electronic components, National Beryllia Corporation offers "BERLOX" (pure BeO) precision electronic parts in all shapes and sizes. Extremely high in thermal conductivity and electrical resistivity, BERLOX is widely used as a combination heat sink and electrical insulator.
>
> Available in production and development quantities, BERLOX is fabricated in heater support plates, micro module wafers, cathode heater shields, precision standoff insulators, tubes, rods and bars. (Deft. Ex. A-1, 76).

Mr. Hay was familiar with at least one of National Beryllia's publications in 1961 describing the thermal conductivity of beryllium oxide as it related to its purity. At about the same time that he received the first core samples from National Beryllia, Hay also received a graph illustrating the thermal conductivity of Beryllia in relation to its beryllium oxide content. (Deft. Ex. A–12). One of the vital claims in the 090 patent is the use of "said beryllium oxide comprising at least 90 percent by weight of said insulative core." (Column 3, lines 39 and 40).

Hay's use of beryllium oxide was the result of a suggestion by a salesman, what he observed at a public trade show, and the published material of the plaintiff's supplier of beryllium oxide cores, National Beryllia Corporation. In short, it was the prior art, consisting of the National Beryllia publications, particularly the graph, that made the use of beryllium oxide cores obvious to Mr. Hay. The fact that the plaintiff was the first one to use beryllium oxide rods as cores in electrical resistors does not mean that such use was not obvious. It merely means that Hay was the first to recognize its obviousness. Plaintiff argues that Hay's use of beryllium oxide is analogous to the battery situation in United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). I find *Adams* inapposite. This is certainly not a situation of combining old materials in new ways. This was purely the substitution of one material for another, i. e., beryllium oxide for steatite or alumina. And the new material was already well-known. It was the National Beryllia's graph that disclosed that the higher the purity of beryllium oxide, the greater would be its heat dissipating qualities. The adaption by Hay of beryllium oxide was obvious to him and would have been to anyone skilled in the art. He simply took a commercially available product that lived up to its advertised claims and used it as a core material. All that Dale does is use beryllium oxide of high purity as a core in the same way that other core materials have been used in the past.

I rule that the 090 patent is invalid because of obviousness.

### 2. Hay As Inventor

The defendant further claims that Hay was not the original inventor of the subject matter of the 090 patent. While there is a real question as to whether or not this patent can, in fact, be termed an invention, I do find that Hay was the first one to realize the obviousness of using beryllium oxide as a core in electrical resistors. Defendant's claim is based on the deposition testimony of George Risk, former president and owner of the plaintiff corporation. I have read Mr. Risk's deposition carefully. He testified that he had Hay make the claim of inventorship, although he himself was the actual inventor because in this way he could enhance the standing of his company, i. e., Dale, in the financial community. According to Mr. Risk, financiers would be chary of investing in Dale if they thought that Risk himself was indispensable to the company as both administrator and inventor. Risk, therefore, according to his own testimony, in order to demonstrate to the financial community that he was building a sound business had an employee who worked on an invention apply for the patent and represent that he was the inventor, even though Risk himself was the actual inventor. While such a procedure may have impressed the financial community, it, of course, was a fraudulent representation as to anyone investing in a Risk company and, further than that, if such explanation is true, it means that both Hay and Risk have committed a fraud on the Patent Office. I do not accept Risk's explanation. I take into consideration that his departure from Dale was not under happy circumstances, and that, while he may have given some thought to the use of beryllium oxide as a resistor core while he was in charge of the plaintiff corporation, the thought lay dormant until after

Dale's successful use of beryllium oxide as a core material.

I have also read Mr. Matejka's deposition and I give more credence to that than I do to the Risk deposition. Risk comes across in his deposition as being an extremely sharp and shrewd operator with little respect for the truth of patent law. I cannot make such an appraisal of Matejka. It is probable that he did envision the use of beryllium oxide as a core material after seeing how it performed in the "boats" that Dale was using in some of its experimental work.

■ I find, specifically, that B. F. Hay acted in good faith when he claimed the invention outlined in patent 090. Risk and Matejka may also have realized that beryllium oxide would made a good electrical core resistor material, but their idea as to its use was never translated into action. Risk and Matejka may even have suggested to Hay that beryllium oxide ought to be considered as a core material, but serious consideration started with the salesman from Frenchtown Porcelain and came to fruition through the trade show and the publications of National Beryllia.

### 3. The Requirements of 35 U.S.C. § 112.

■ The defendant alleges that the 090 patent fails to contain:

> a written description of the invention, and of the manner . . . of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . . 35 U.S.C. § 112 ¶ 1.

A great deal of cross-examination was directed at this point, but, in my opinion, it comes to nought. The claims of the patent are clear and concise and it is difficult to see how anyone skilled in the art would not be able to use the patent as the basis for making a working beryllium core electrical resistor. As I have already ruled, the National Beryllia publications made its use as the core for electrical resistors obvious to anyone skilled in the art and the patent discloses very little not already covered in the prior art.

### 4. Fraud On The Patent Office

■ Defendant points out correctly that the plaintiff included in its file wrapper material, page 38, an exact copy of the National Beryllia graph illustrating the relationship between the thermal conductivity of beryllium oxide and its purity. Defendant argues that this was a representation that this graph had been prepared from data obtained in experiments performed by the plaintiff and that, therefore, the Patent Office was misled by the graph. The defendant urges that lack of candor is equivalent to fraud and misrepresentation and cites language in Monsanto v. Rohn and Haas Co., 312 F.Supp. 778, 794 (E.D. Pa.1970), aff'd 456 F.2d 592 (3 Cir. 1972), cert. denied, 407 U.S. 934, 92 S. Ct. 2463, 32 L.Ed.2d 817 (1972), to that effect. I do not think that, under the facts of this case, the failure to disclose the source of the graph rises to the level of fraud and misrepresentation. The graph was submitted only as additional corroboration for plaintiff's claim that beryllium oxide of more than ninety percent purity was essential for proper functioning of the core. The graph did not misrepresent or distort the facts. Nor was the Patent Examiner misled. In the rejection that followed the submission which included the graph, the Examiner noted:

> It could be added that it is old in the electrical heat conducting art to use a heat conductive element comprising at least 90% beryllium oxide by weight thereof. (File Wrapper, page 61).

While it would have been preferable for Hay to disclose to Mr. Holmberg, Dale's house counsel, where the graph originated, there certainly was no fraud or misrepresentation on the part of the patent attorneys who submitted the materials to the Patent Office. Furthermore, Hay never claimed in either the

patent or any of the materials submitted by him to his attorneys that he was in any way responsible for the composition of the beryllium oxide. This is not like the deliberate misrepresentation that the court found in Monsanto v. Rohm and Haas Co., *supra,* nor is it akin to the false data that was given to the Patent Office in Precision Instrument Mfg. Co. et al. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

I find that there was no fraud or deliberate misrepresentation on the Patent Office.

## B. INFRINGEMENT

■ While my finding of invalidity might dispose of the issue of infringement, caution and fairness to the Court of Appeals require that I make a finding on this issue also. If I am wrong as to the validity of the patent, then I find that there is infringement. The defendant does use "an electrical resistance element in engagement with and substantially covering the outer surface of said insulative core." The defendant's argument as to what constitutes "substantial covering" is not only highly technical, but, in my opinion, specious. The defendant can't escape infringement by spacing its wires further apart than the plaintiff's. The test is "substantially covering" in its usually understood sense. I find that the defendant's wires do substantially cover the core as that phrase is usually understood.

Nor does the defendant's argument relative to temperature performances withstand scrutiny. This claim is a measure of minimum performance, not an exact standard that can be evaded by exceeding it or failing to meet it. If the patent is valid, then the defendant's use of beryllium oxide as a core for its electrical wire-wound resistors is an infringement of it.

## THE 855 AND 704 PATENTS

These two patents will be treated together. The 855 patent is a so-called method patent and the 704 patent is the resulting embodiment product.

The defendant attacks both patents on two grounds:

1. That they failed to meet the "best mode" requirement of 35 U.S.C. § 112, and the other requirement relative to containing a full, clear, concise, and exact description of the invention; and

2. That they were obvious because of the prior art. 35 U.S.C. § 103.

The defendant also asserts that the 704 patent is invalid because it was first in public use and on sale in March of 1961, contrary to 35 U.S.C. § 102(b).

The claim of infringement is also seriously contested.

## BACKGROUND

These patents are concerned only with electrical resistors that are placed inside a metal housing. Housed resistors have their wire-wound cores embedded in an insulative material which is enclosed within the housing. The process of putting the insulative material around the core is called "potting." After the core is potted within the housing, the housing is secured to a metal object. The purpose of the housing is to transfer away from the resistor the heat that is built up within it when it is under electrical load. The plaintiff was experiencing heat dissipation problems with its resistors. Indeed, prior to the use of the method described in the 855 patent, most of Dale's advertised 25 watt resistors failed to function at this load. Hay, the inventor, believed that this was due to air pockets that formed in the insulative material and impeded the flow of heat from the core to the housing. The purpose of the method described in the 855 patent is to tightly embed the core in a solid mass of insulative material within the housing. This is accomplished by placing the wire-wound core within the housing and then by the use of a pressure molding machine forcing a single hardenable insulative fluid from the molding machine into the space between the housing and the core. When

the insulative material has hardened, the wire-wound core is firmly embedded within the housing.

The basic difference between this and other methods used in the industry was the direct injection under pressure of the insulative material into the space between the core of the resistor and the walls of the housing. In effect, the housing becomes a permanent mold. There are two other methods of embedding the core within the insulative material. One is the "gravity pour" method which consists of pouring the hardenable material around the core under atmospheric pressure. The other, and one used extensively by R.C.L., is the so-called "stuffing" method which consists of placing the core in a mold and then pressure forcing the hardenable insulative fluid into the mold around the core. After the fluid has hardened and the core is embedded in it, the mold is removed and the core, plus the hardened insulative material is then forced, i. e., "stuffed" by a machine into the metal housing. The metal housing is heating during this process of stuffing so that it expands sufficiently to allow the core and insulative material to be forced into it. When the housing has cooled, it contracts and tightens around the insulative material.

It is thus apparent that the 855 and 704 patents and the "stuffing" method depend upon the use of pressure to force the hardenable insulative fluid around the core.

## A. VALIDITY

### 1. The Requirements of 35 U.S.C. § 112.

Paragraph 1 of 35 U.S.C. § 112 requires:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Neither the 704 or 855 patent specify the hardenable insulative material to be used.

There are high-temperature plastic insulation materials which are suitable and I recommend materials in the classifications of epoxys, phenolics or silicones. These three compounds with perhaps suitable mineral fillers are excellent for transfer molding. The use of powder or pellet material plastic casting is usually known as "pressure casting" or "plastic injection molding." Pressure plastic molding machines use both heat and pressure to solidify the powder or pellet plastic material within the cavity mold. 855 Patent, Column 2, Lines 47–57. To the same effect, 704 Patent, Column 2, lines 53–62.

The inventor testified on cross-examination that in order to determine which plastic insulative materials should be used in the method described in his patent, it would be necessary to experiment with various materials. (R. 102, 103).

It is obvious that the claims of patents 704 and 855 seek to include within their scope any of the known insulative materials, i. e., epoxys, phenolics, or silicones, that are susceptible of being pressure molded. It is the method of using these materials, not their composition, which the patents describe. Pressure molding by whatever name, i. e., transfer molding or injection molding, was well-known in the molding art in 1960. (R. 326). Dr. Patrick, the plaintiff's expert, testified that as one skilled in the molding art, he could have successfully molded a resistor in accordance with the 855 patent and explained how he would have obtained the materials. (R. 326, 327, 328). Even he, however, would have had to experiment with the materials after they had been obtained. Such selection and subsequent experimentation required the knowledge of one skilled in the plastic molding art. This

is not the art to which the patents pertain. The art that is pertinent is the electrical resistor art. Dr. Patrick's testimony compels the finding that only a person skilled in the plastics art could determine what type of insulative material should be used in order to obtain the results claimed in the 704 and 855 patents and that even such a person would have to experiment to determine the most suitable material. This conclusion is buttressed by the fact that at the time the patents were filed, the inventor had discovered, after extensive experimentation, only one material, Roger RX 600, that worked satisfactorily. (R. 101–105). And this material was not disclosed in the patents.

The reasons for the requirements of 35 U.S.C. § 112 are set forth in Flick-Reedy Corp. v. Hydro-Line Mfg. Co., 351 F.2d 546, 550–551 (7th Cir. 1965):

> The Constitutional provision and implementing patent law are intended to reward with a seventeen-year monopoly an inventor who "refrains from keeping his invention a trade secret." Universal Oil Products Co. v. Globe Oil & Refining Co., 322 U.S. 471, 484, 64 S.Ct. 1110, 1116, 88 L.Ed. 1399 (1944). The *quid pro quo* for the monopoly is disclosure which will enable those skilled in the art to practice the invention at the termination of the monopoly, and to "warn the industry concerned of the precise scope of the monopoly asserted." Id. To accept the monopoly and withhold the full disclosure of the "best mode contemplated by the inventor," which will result in a contribution to the common good upon expiration of the monopoly is the "selfish desire" against which 35 U.S.C. § 112 is directed. Application of Nelson, 280 F.2d 172, 184, (47 CCPA 1031).

■■ The requirements of 35 U.S.C. § 112 are not met by outlining a field for further experimentation. Sears Roebuck v. Minnesota Mining & Mfg. Co., 243 F.2d 136, 141 (4th Cir. 1957):

> It is not sufficient for a patent to suggest a field for further experimen-

tation; to be valid it must itself disclose the essential elements of the discovery so that persons skilled in the art may practice it.

The First Circuit case cited by the plaintiff is obviously inapposite. In Teledyne Mid-America Corp. v. International T. & T. Corp., 449 F.2d 502 (1st Cir. 1971), the experimentation referred to was one that could be performed without difficulty and did not require skill and training in another art. The plaintiff's desire to bring all types of insulating material within the scope of its patent claim without disclosing the one material that worked effectively has resulted in a description too vague for an accurate and effective disclosure of the invention. I rule that the 855 and 704 patents are invalid because they do not meet the requirements of the first paragraph of 35 U.S.C. § 112.

### 2. Obviousness

There is nothing in the prior art that makes these patents obvious. The defendant misreads the scope of the patents when he stresses the fact that prior to 1961, phenolics, silicones, and expoxies had been considered as preferred electric insulation materials for high temperature applications where heat transfer characteristics were needed. The plaintiff concedes that the techniques of pressure molding, which term includes transfer and injection molding, were in existence and known in 1960. The basis of these patents is not the use of specific insulative materials or pressure molding techniques, but the use of the housing for an electrical resistor core as a permanent mold into which the insulative material is forced. None of the prior art literature relied on by the defendant made this obvious. Nor did the Thom and Mochi patents make the plaintiff's method obvious. These two patents were cited and considered by the Patent Examiners handling the 704 and 855 claims, and I find no basis for refuting their finding of nonobviousness.

I rule that the 704 and 855 patents meet the requirements of 35 U.S.C. § 103.

### 3. Public Sale

The defendant claims that the 704 patent is invalid under 35 U.S.C. § 102(b) because resistors embodying the structure disclosed therein were on public sale in March of 1961, which was more than a year prior to the date of the patent application, November 19, 1962.

There is no doubt that resistors of the type described in the 704 patent were publicly displayed at a trade show by Dale in March of 1961, and that the date of the 704 patent application was November 19, 1962. It is also true, however, that the 855 patent was filed on February 21, 1961, and the 704 patent recites: "Original filed February 21, 1961." 35 U.S.C. § 120 provides:

> § 120. *Benefit of earlier filing date in United States*
>
> An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application.

35 U.S.C. § 121 provides in pertinent part:

> § 121. *Divisional applications*
>
> If two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions. If the other invention is made the subject of a divisional application which complies with the requirements of section 120 of this title it shall be entitled to the benefit of the filing date of the original application. . . .

Since the 704 patent is a divisional application of the 855 patent and refers specifically to that patent application which was pending on November 19, 1962, the issue is whether it claims an invention disclosed in the 855 patent application "in the manner provided by the first paragraph of section 112 of this title."

I assume, of course, for purposes of this portion of my opinion that, contrary to my finding, the requirements of the first paragraph of section 112 have indeed been met by the 855 patent.

Defendant contends primarily that the parent application fails to disclose an insulative material "having a density greater than that of identical material formed into a solid under atmospheric pressure" and that such omission is fatal.

The defendant also claims, almost as an aside, that the failure to use the word "capsule" in the parent application offends the critical requirement of 35 U.S.C. § 120. My determination of these factual issues must start with the legal ground rules. In Acme Highway Products Corp. v. D. S. Brown Co., 431 F.2d 1074 (6th Cir. 1970), cert. denied, 401 U.S. 956, 91 S.Ct. 977, 28 L. Ed.2d 239 (1971), the court held:

> The inquiry required by section 120 demands a comparison not only of the claims of the parent and continuation-in-part applications, but also of any other disclosures made in the applications. Thus, a feature claimed in the second application which was not claimed in the first, but which appeared in the specification or drawings of the first, is considered to be disclosed in each. An application effects a reduction to practice of everything disclosed therein, regardless of what is claimed. Chapman v. Wintroath, 252 U.S. 126, 137, 40 S.Ct. 234, 64 L.Ed. 491 (1920); Benedict v.

Menninger, 64 F.2d 1001, 1003, 20 CCPA 1138 (1933); Arnold v. Langmuir, 36 F.2d 834, 835, 17 CCPA 756 (1930). At page 1079.

■ It has also been held that if the disclosure was inherent in and fully present in the earlier application, this satisfies the statute even though exact terminology is lacking. Illinois Tool Works, Inc. v. Continental Can Co., 273 F.Supp. 94, 103 (N.D.Ill.1967). As pointed out in Bendix Corp. v. Balax, Inc., 421 F.2d 809, 818 (7th Cir. 1970), the issue is whether the claimant is attempting to extend its patent monopoly beyond the limits of the original claimed invention. To paraphrase Judge Hastings in *Bendix, supra*: In essence, the issue under consideration in the instant case is whether there was *adequate disclosure* in the original method invention to support the separate distinct resistor application.

With these principles as a frame of reference, I now proceed to examine the 855 patent application. Page 4 of the file wrapper contains the following language:

A congealing liquid plastic is not recommended. I recommend instead a transfer molding process which uses a powder or pellet type insulation which when introduced under pressure and heat first liquefies and then hardens into a very dense solid plastic insulation. By the use of the transfer molding process as compared to the liquid plastic, I have raised the operation of the resistor unit from approximately eighteen watts to twenty-five watts. This increased effectiveness is at least partly due to the increased density of the hardened plastic insulation which is more efficient in transferring heat from the resistor directly to the metallic hollow cylinder 17, and which in turn dissipates heat to the atmosphere and the base support to which the unit is secured. Also, by the insulation being pressure molded in the bore, the resistor therein will not only be completely imbedded (except its leads) in the plastic insulation but will be supported properly in all

directions and rigidly held against detachment from the housing 17.

The 855 file wrapper makes it clear that the insulative material forced into the housing by a pressure molding machine must, of necessity, have a greater density than material poured into the housing under atmospheric pressure. One of the claims of the 704 patent is:

said insulation material having a density greater than that of identical material formed into a solid under atmospheric pressure, . . . . Column 4, lines 16–18.

This does not in any way extend the scope of the patent. Although the exact words of the 704 claim were not used in the 855 patent application, the disclosure of it was obvious to anyone reading the file wrapper. No special understanding of pressure molding is required to realize that the density of a material is increased when pressure is applied to it.

The defendant has also seized upon the use of the word "capsule" in column 1, line 69, of the 704 patent description as adding a new dimension to the 855 application. This is a purely boot-strap attempt by defendant's counsel to take advantage of his own adroit but largely irrelevant cross-examination as to the meaning of the words "capsule" and "encapsulated." The sentence in which the word is used reads:

The physical features of ordinary electrical resistors consist of a cylindrical body or *capsule* having therein the usual wire coil, and caps and at each end, respectively, of the body. [Emphasis added.]

The use of the word "capsule" does not add any special meaning to the 704 patent and it is used only as a synonym for the words "cylindrical body."

■ I rule that the 704 patent is not invalid under 35 U.S.C. § 102(b).

B. INFRINGEMENT

There are three main claims of infringement as to the 704 and 855 patents:

1. That the defendant's accused operation infringes the 855 patent;

2. That the defendant's housed resistors made by its in-housing molding method infringe the 704 patent; and

3. That the defendant's housed resistors made by the "stuffing" method infringe the 704 patent.

### 1. The 855 Claim

The 855 patent method can be summarized as follows:

A resistor element consisting of a wire-wound core is placed in the bore of a resistor housing and a space is created entirely around the elongated body of the resistor element,

the ends of wire leads from the core are inserted through separate closure means having opposite vertical bearing surfaces so that the resistor element is supported only by the wire leads,

the closure means are then placed in engagement with each end of the housing and forced against the ends of the housing so that the housing is effectively sealed tight, an access opening into the bore is provided,

a single hardenable insulative fluid from the high pressure system of an injection molding machine is forced through the access opening to fill the space in the bore around the entire surface of the wire-wound core, and

the hardenable insulative fluid is allowed to harden thus permanently embedding the core in the housing, the closure means at each end of the housing are then removed.

The defendant's "in-housing" molding method as described by its expert involves the following:

The initial coating of a resistor element by a multiple dipping process so as to form an appreciable layer of insulation material which is cured at atmospheric pressure,

the positioning of this precoated resistance element in the housing,

the sealing of the ends of the housing with conical inserts, and

then the filling of the remaining space in the bore between the initial coating material and the inner housing wall with a thermosetting silicone resin by a low-pressure transfer molding process.

Both the patent and the defendant's method depend upon filling the space between the resistor element and the housing wall with an insulative material by a pressure molding process. Defendant seeks to avoid the claims of the patent on three grounds:

1. That its resistor is precoated with an atmospherically cured insulation by multiple dipping;

2. The manner in which the ends of the housing are sealed for the molding process; and

3. That the molding is done by a low-pressure transfer process.

None of these differences are sufficient to avoid the basic claim of the 855 patent which is the "in-housing" pressure molding process. All three are but minor variations on the main theme of the patent.

At the trial it was established that it is routine in the industry to dip the wire-wound core of a resistor into some sort of a substance, usually silicone, to protect and strengthen the wires. The dipping process neither adds nor detracts from the embedding process which is the heart of the patent.

The difference in the way the defendant seals the ends of its housing for the molding process is not only insignificant but is disclosed in the 855 patent. See column 4, lines 7–14. The use of conical members to seal the ends of the housing rather than flat plates are an obvious attempt to avoid the patent. While it is necessary for the ends of the housing to be sealed so that the molding process will be effective, the method of sealing is not crucial.

█ There was a good deal of testimony and cross-examination directed at the terms "pressure molding," "transfer

molding," and "injection molding." The defendant cannot avoid the patent by resorting to semantics. The fact is that the defendant's in-housing molding system depends, as does the plaintiff's patented process, on forcing the insulative material into the housing by a pressure molding machine. I find that if the 855 patent is valid, the defendant's in-housing molding process infringes it.

### 2. The 704 Infringement Claim As To Defendant's Resistors Made By Its In-Housing Molding Method

It follows that since the defendant's in-housing molding method infringes the plaintiff's method patent, the resistors made by this method infringe the 704 patent.

Defendant's main line of attack on the 704 infringement claim is that its resistors do not have a single dense hard homogeneous insulation material between the resistor element and the housing wall. Here again, the defendant tries to obscure the facts by the adroit and skillful use of words. Both defendant's resistor elements and the plaintiff's 704 resistor elements are firmly embedded in a hard densely packed insulated material that extends from the core, either dipped or undipped, to the housing wall. The forensic attempt by defense counsel to use the words "single layer," "homogeneous," and "complete and direct engagement" to obscure this basic fact fails.

Defendant's claim that its insulation material does not have a density greater than that of identical material formed into a solid under atmospheric pressure depends upon the acceptance of defense counsel's definition of density. While I can admire the skill of counsel in dissecting various definitions of density (see particularly cross-examination of Patrick and direct examination of Altieri), my admiration does not blind my eyes to the fact that an insulative material forced into a mold under pressure is more tightly packed, i. e., more dense than the same material poured in under atmospheric pressure.

I find that the defendant's resistors made by its in-housing molding method infringed the 704 patent, assuming, of course, the validity of the patent.

### 3. The Claim of Infringement Of The 704 Patent By The Defendant's Resistors Made By The Stuffing Method

The plaintiff makes no claim that the defendant's stuffing method infringes the 855 patent. The issue then is whether the resistors made by this method infringe the 704 patent. The teaching of Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed.1136 (1898), is still good law.

> We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided. (Cases omitted.) The converse is equally true. The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent, literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent. At page 568, 18 S.Ct. at page 722.

So also in Foster Cathead Co. v. Hasha, 382 F.2d 761 (5th Cir. 1967):

> "It is well settled that merely because the claims in suit taken literally read element by element on the accused device does not establish infringement, nor does it establish a presumption of infringement. The patentee in order to prove infringement has the burden of showing that the accused structure is the equivalent of the particular embodiment of the claimed structure disclosed in the specification and drawings. That is, the patentee, while he may be allowed some range of equivalents, must compare the accused structure with the patented structure as disclosed in the specification and drawings, and he

must establish substantial identity of means, operation and result. Unless the patentee can carry this burden, the mere fact that his claims are broad when taken literally and clearly read on the accused device will avail him nothing. Moreover, this is true regardless of the prior art. That is, even though the patentee may have developed a broad novel concept, a new function, done a thing never before done, yet he cannot patent all ways of doing the thing, even though he was the first to do it. Accordingly, no matter how broad the claims may be when taken literally, and even though they may avoid the prior art when given the broadest interpretation, nevertheless the claims can cover only the particular embodiment the patentee has disclosed and equivalents thereof. Of course, the range of equivalents will vary depending on the merit of the invention."

C. Pigott, Equivalents in Reverse, 43 Journal of the Patent Office Society 291–92 (1966); accord 35 U.S.C. § 112; Graver Tank Co. v. Linde-Air Prod. Co., 1950, 339 U.S. 605, 608–609, 70 S.Ct. 854, 94 L.Ed. 1097, 1102; Skirow v. Roberts Colonial House, Inc., 7 Cir. 1966, 361 F.2d 388, 391; Texsteam Corp. v. Blanchard, 5 Cir. 1965, 352 F.2d 983, 986; Industrial Instrument Corp. v. Fox-Boro Co., 5 Cir. 1962, 307 F.2d 783, 785; Stewart Warner Corp. v. Lone Star Gas Co., 5 Cir. 1952, 195 F.2d 645, 648; Getty v. Kinzbach Tool Co., 5 Cir. 1941, 119 F. 2d 249, 250, cert. denied 314 U.S. 651, 62 S.Ct. 97, 86 L.Ed. 522. At pages 765–766.

The defendant's stuffing method is basically different than the method disclosed by the 855 patent. In the stuffing method, the resistive element is coated, placed in a mold, and the insulative material pressure molded around it. The resistive element embedded in the insulative material is then removed from the mold and stuffed by a machine into the housing which has been heated so that it expands sufficiently to receive it.

Even if I assume something that has not been proven, i. e., that the defendant's stuffed resistor is identical to plaintiff's 704 resistor, the 704 claims, which are derived from the 855 claims, do not embody the defendant's resistors made by the "stuffing" method. This is particularly so since there is and can be no claim that the insulative material used in the stuffing method is the same as used in the 704 patent. Plaintiff's failure to specify the insulative material negates any such claim. Nor can it be cogently claimed that the molding process is identical.

██ I rule that the defendant's resistors made by the "stuffing" method do not infringe the 704 patent.

### THE DESIGNING PATENT

#### A. VALIDITY

The defendant attacks plaintiff's 884 design patent on the grounds of obviousness, 35 U.S.C. § 103, and because it violates the conditions of 35 U.S.C. § 102(a)(b), and (g).

#### 1. Obviousness

██ The same requirement of nonobviousness applies to design patents as to patents on processes and products. Hawley Products Co. et al. v. United States Trunk Co., Inc. et al., 259 F.2d 69 (1st Cir. 1958). The teachings of *John Deere, supra,* as to obviousness in the light of the prior art is pertinent. Judge Friendly in G. B. Lewis Co. et al. v. Gould Products, Inc., 436 F.2d 1176 (2nd Cir. 1971), explained the application of 35 U.S.C. § 103 to design patents.

Under 35 U.S.C. § 171, "any new, original and ornamental design for an article of manufacture" is patentable if it also satisfies the other provisions of Title 35 for the granting of patents, with exceptions not here relevant. One such provision is 35 U.S.C. § 103 which denies patentability when

the differences between the subject matter sought to be patented and the prior art are such that the sub-

ject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *

In Graham v. John Deere Co., 383 U. S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), the Supreme Court stated that this provision, added in 1952, 66 Stat. 798, "was intended merely as a codification of judicial precedents embracing the *Hotchkiss* [Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 13 L.Ed. 683] condition, with congressional directions that inquiries into the obviousness of the subject matter sought to be patented are a prerequisite to patentability."

The determination required by *Hotchkiss*, elusive in any case, is particularly so with respect to a design patent. We have frequently indicated that the requirement of invention is not met by a design which is merely "new and pleasing enough to catch the trade"; rather we have insisted that the design reflect "some exceptional talent beyond the skill of the ordinary designer," Neufeld-Furst & Co. v. Jay-Day Frocks, Inc., 112 F.2d 715, 716 (2 Cir. 1940), or "inventive genius," A. C. Gilbert Co. v. Shemitz, 45 F.2d 98, 99 (2 Cir. 1930). We have noted that in view of this "[t]o obtain a valid design patent is exceedingly difficult." Chas. D. Briddell, Inc. v. Alglobe Trading Corp., 194 F.2d 416, 419 (2 Cir. 1952). At pages 1177–1178.

The prior art consists of the Sage housing (Deft. Ex. A–26) and the Cal–R housing (Deft. Ex. A–6).

All resistor housings must, of necessity, have the same basic design because they house the same basic component, i. e., a wire-wound elongated core embedded in insulative material. The ribs on the housing are there not for purposes of ornamentation, but to help dissipate the heat built up in the resistor. The ribs are extruded longitudinally along the housing because that is the most practical way of doing it. Some part of the housing must contain a flat surface so the name of the manufacturer can be imprinted thereon. Moreover, this type of resistor is manufactured to meet military specifications. Testimony of the inventor, Rakowsky, R 570–574, Testimony of Altieri, R 933–934.

The most that can be said for plaintiff's housing design is that it is different to a degree from the other prior art housings. It was not only the prior art, but the dictates of the manufacturing process that made the design obvious. "If the design of the patent is dictated primarily by functional needs the patent is invalid." Methode Electronic, Inc. v. Elco Corp., 385 F.2d 138, 141 (3rd Cir. 1967).

■ I rule that the 884 design patent is invalid because of obviousness and because it fails to meet the requirements of 35 U.S.C. § 171.[1]

*2. 35 U.S.C. § 102(a), (b), and (g)*[2]

■ Defendant's claim as to the violations of 35 U.S.C. § 102(a), (b), and

---

1. "Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title."

2. "A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or

a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

* * * * *

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

(g) depends entirely on the assertion of Matejka, a former officer and employee of Dale, that he evolved the design, and models embodying it were exhibited at a trade show in March of 1962. The testimony of the photographer who took pictures of these models in 1965 leaves this claim very much in doubt. My ruling as to this claim is the Scotch Verdict; Not Proven.

## B. INFRINGEMENT

The test to determine if there has been infringement of a design patent was laid down over a hundred years ago in Gorham Company v. White, 14 Wall. 511, 81 U.S. 511, 20 L.Ed. 731 (1871). It is succinct and clear.

We hold, therefore, that if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other. At page 528.

I cannot find that even a casual examination of the Dale and R.C.L. housings would result in any confusion to a prospective purchaser. The Dale housing has five ribs on a slightly curved surface culminating directly on a flat surface at the top of the housing. The R. C.L. housing has three ribs on a straight plane, then a beveled surface with a flat surface on top. The housings look different and feel different. The only thing identical about them is their color.

I rule that, even if the design patent is held to be valid, there has been no infringement of it by defendant's housing.

## THE CLAIM OF UNFAIR COMPETITION

In 1964 Ferroxcube, a customer of the plaintiff, requested that the defendant manufacture panel housed resistors to specifications that it furnished. There is no doubt that the defendant knew that Ferroxcube was asking it, in effect, to copy plaintiff's resistors, Model PH–10. (See Pl.Ex. 11–B and 15). The plaintiff stresses the fact that it adopted the term PH as a model designation for its panel mounted resistors in 1955 and subsequently used the designation PH–10 on these units. No great deductive ability is needed to conclude that PH is shorthand for "panel housed." Plaintiff has no trademark rights in the initials PH nor do they constitute a trade secret. All of the defendant's resistors were clearly marked "RCL PH–10–150." Any prospective buyer could readily ascertain that the resistors were manufactured by the defendant by looking at the marking. There is no evidence that the defendant attempted to sell these resistors to anyone but Ferroxcube who asked it to manufacture the resistors to plaintiff's specifications.

The plaintiff now makes no claim of patent infringement as to the Model PH–10 resistor, such claim having been withdrawn prior to trial. The evidence also establishes that the only one confused, if there indeed was any confusion, as to the source of the resistors, was Ferroxcube who sent some of the defendant's manufactured resistors back to the plaintiff, along with plaintiff's resistors, because they were not up to standard.

These facts fail to establish any unfair competition by the defendant.

## THE 356 PATENT

Although the plaintiff has dropped its claim of infringement of this patent prior to trial, defendant takes the position that its validity is still in issue. I do not agree. Defendant's counterclaim is dismissed because there is no justiciable controversy before the court.

I point out, moreover, that defendant's claim of fraud on the Patent Office for failing to call pertinent prior art to the Patent Examiner's attention rests in large measure on the deposition testimony of George Risk. As I indicated earlier, the credibility of Mr. Risk does not

impress me. While I have no doubt that Mr. Risk might conveniently forget or omit pertinent prior art references if it suited his interests to do so, his deposition testimony is not firm footing for a finding of fraud on the Patent Office.

. . . . . .

In making the findings of fact herein, I have excluded the correspondence between Attorneys Holmberg and Zarley on the grounds of privilege and relevancy. I have admitted all other material offered as exhibits at the trial. Plaintiff's objections based on 35 U.S.C. § 282 are overruled. The case was intensively prepared, well tried, and thoroughly briefed by both counsel. I specifically find that plaintiff's counsel had adequate, if not technically correct, notice of the prior art exhibits to which he objects. It is obvious that the National Beryllia graph and publications are crucial to my findings as to the 090 patent. While these prior art exhibits may not have been noticed in accord with the wording of 35 U.S.C. § 282, plaintiff's counsel did have notice of them at the time of Hay's deposition. Furthermore, the inventor Hay should not be allowed to take advantage of his lack of candor with the Patent Office in regard to the source of the graph.

Defendant's request that it be awarded counsel fees is denied.

### SUMMARY OF RULINGS AND FINDINGS

1. The 090 patent is found invalid because its subject matter was obvious in the light of the prior art.

2. The 855 and 704 patents are found invalid because they fail to meet the requirements of the first paragraph of 35 U.S.C. § 112.

3. The 884 design patent is found invalid because of obviousness and because it does not embody a new, original, and ornamental design. 35 U.S.C. § 103, 35 U.S.C. § 171.

4. The plaintiff's claim of unfair competition as to its PH–10 resistors has not been proven.

5. The defendant's counterclaim as to the 356 patent is dismissed because it does not state a judiciable controversy.

Judgment for the defendant in the main case.

Judgment for the plaintiff on the counterclaim.

So ordered.